UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ALFRED VELA, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   CAUSE NO. 3:16-cv-51-JTM-MGG |
| | ) |
| JOSEPH THOMPSON, *et al.* | ) |
| | ) |
|    Defendants. | ) |
| | ) |

**REPORT AND RECOMMENDATION**

Through the instant lawsuit against Defendants Corizon Health, Inc. and Dr. Joseph Thompson ("Defendants"), Plaintiff alleges that while he was incarcerated, he received inadequate medical care following a fall on February 1, 2014, that allegedly caused his paraplegia. [DE 1]. Defendants moved for summary judgment, arguing that the Plaintiff, a prisoner represented by counsel, failed to exhaust his available administrative remedies prior to filing suit as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). [DE 18]. Even though the parties agreed that Plaintiff had not filed a formal grievance before initiating this lawsuit on February 1, 2016, the presiding judge found that questions of fact precluded summary judgment because Defendants failed to meet their burden of proving the availability of administrative remedies to Plaintiff. [DE 28 at 7–8].

The presiding judge referred this matter for a report and recommendation to resolve questions of fact required to determine as a matter of law whether or not, in light of *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532, 538 (7th Cir. 1999) and *White v. Bukowski*, 800 F.3d 392, 395 (7th Cir. 2015), a remedy was "available" to Plaintiff such that he was required to file a grievance before filing this lawsuit. [*Id.*]. The presiding judge noted that "the sequence of

events related to the development and progression of plaintiff's condition, his awareness of his condition, the information and advice he received from physicians, etc., is murky . . . ." [*Id.* at 7]. Accordingly, the undersigned set deadlines for the parties to conduct discovery, including depositions and written discovery, on the exhaustion issue and then held an evidentiary hearing on June 28, 2017.

Plaintiff appeared at the evidentiary hearing with counsel Jared Kosoglad. Plaintiff testified on his own behalf. Defendants were represented by attorneys Carol Dillon and Britney McMahan. No one testified on behalf of Defendants; however, Defendants admitted into evidence six Requests for Healthcare submitted at the prison by Plaintiff on February 10, 2014; February 11, 2014; February 20, 2014; February 24, 2014; March 2, 2014; and March 21, 2014. As now developed by the record before this Court, the evidence brings clarity to the sequence of events related to Plaintiff's condition and his awareness of his condition. However, minimal evidence has been presented as to the medical advice Plaintiff received from physicians.

I. **RELEVANT BACKGROUND**

　A.　Facts

The following facts are not in dispute based on Plaintiff's testimony at the evidentiary hearing and the parties post-hearing briefs, which included the transcript of Plaintiff's deposition [DE 50-1] on exhaustion issues taken on May 2, 2017.

After falling on an icy sidewalk at the Indiana State Prison on February 1, 2014, Plaintiff suffered constant, severe, and worsening leg and back pain as well as numbness and ultimately paralysis in his legs. As a result, Plaintiff sought medical care by submitting fourteen Requests for Healthcare between February 1, 2014, and December 29, 2015. [*See* DE 21-3]. Six Requests, dated from February 10, 2014, through March 21, 2014, were admitted into evidence

2

at the evidentiary hearing. Plaintiff admits that he received medical care in response to each Request for Healthcare. [DE 54 at 18:21–23]. Moreover, Plaintiff testified that he received medical care on some occasions where he had not submitted a Request for Healthcare. [*See id.* at 22:8–22]. Plaintiff, however, never filed any grievances related to the quality of his medical care. [*See id.* at 5:13–14].

The progression of Plaintiff's symptoms are documented through the six Requests for Healthcare admitted into evidence at the evidentiary hearing. Plaintiff's Request for Healthcare dated February 10, 2014, reported his pain and ambulation problem and explicitly stated: "I think I have a pinched nerve." [DE 21-3 at 2]. In his Request on February 11th, Plaintiff reported that he lost feeling in his legs, could not walk, and had severe back pain. At the hearing, Plaintiff admitted that he knew something was wrong at that time, but not exactly what. [DE 54 at 10:8–11; *see also* DE 50-1 at 11, 9:11–14]. A couple weeks later, Plaintiff fell to the ground when he got out of bed at which point he "knew something wasn't right and that what [he was] feeling wasn't normal," according to his testimony. [DE 54 at 10:14–19; *see also* DE 21-3 at 13, 11:11–19].

On February 20, 2014, Plaintiff then filed his next Request asking for a refill of Vicodin based on the assumption Vicodin had been the medication he had been taking. [DE 21-3 at 4]. Using exclamation points as was his habit, Plaintiff reported: "I still have pain! I have arthritis in my back and my legs are in severe pain!" and rated his pain at 10 on a scale of 1 to 10. [*Id.*]. Plaintiff testified that at that time he was not happy with his care and "figured something more could have been done" to relieve his severe pain. [DE 54 at 11:15–18]. Plaintiff also testified that at that time he wanted to see a doctor outside the prison because he knew the prison doctors were "limited to what they could do there." [*Id.* at 13:8-11].

3

On February 24, 2014, Plaintiff submitted another Request for Healthcare asking for a refill of pain medication due to severe pain in both legs. [DE 21-3 at 5]. In that Request, Plaintiff reports that he fell in the shower on February 21st, reinjuring his back, and bruising both of his knees. [*Id.*]. Plaintiff also stated: "I would still like to know what's wrong with me? Need outside hospital!" [*Id.*]. In his testimony, Plaintiff confirmed that "at that time [he was] wanting to go to an outside hospital." [DE 54 at 14:25–15:2; *see also* DE 50-1 at 14–15; 12:25–13:15].

On March 2, 2014, Plaintiff submitted another Request for Healthcare reporting severe pain in both legs and his lower back along with the inability to walk and the ineffectiveness of ibuprofen and Prednisone on his condition. [DE 21-3 at 6]. Plaintiff's last relevant Request for Healthcare was submitted on March 21, 2014, and reported: "I still have severe pain in both my legs with numbness and I still can't walk?" [*Id.* at 7]. In that Request, Plaintiff also reported that he had seen a neurologist who said he did not need surgery, but that Dr. Thompson at the prison had hold him he did need surgery. He then states that he "would like to see a different neurologist for a second opinion!" [*Id.*]. Plaintiff concludes the Request noting that he needed surgery to fix the pinched nerve so he could walk again. [*Id.*]. At the hearing, Plaintiff testified that he was unable to walk at the time of this Request. [DE 54 at 17:5–6]. Plaintiff also testified that from March 2nd through March 21st he was completely numb from the waist down, could not walk, was in severe pain, was urinating and defecating on himself, and rated his pain as a 10—the worst pain he had ever felt. [*Id.* at 17:7–23; *see also* DE 50-1 at 16–17; 16:21–17:22].

As the result of his Requests for Healthcare, Plaintiff was referred for surgery to fuse three spinal discs, which occurred on April 10, 2014. Plaintiff's surgeon asserted that the surgery went well with hope that Plaintiff would be able to walk again with appropriate physical

4

therapy. Shortly thereafter, Plaintiff was transferred to the Miami Correctional Facility on April 21, 2014, where he participated in physical therapy for twelve weeks. Plaintiff was transferred back to Indiana State Prison on February 4, 2015.

On cross examination, Plaintiff testified that at no point through the end of March 2014 did he ever have any reason to believe that the medical care he received from Dr. Thompson was inadequate. [DE 54 at 19:8–11]. Plaintiff explained that Dr. Thompson treated his condition and gave him medical advice upon which he relied without any reason to do otherwise. [*Id.* at 20:24–21:15]. Plaintiff also testified that he never thought his ongoing pain and loss of sensation had anything to do with the kind or quality of care that Dr. Thompson was providing. [*Id.* at 22:23–23:2]. At his deposition, Plaintiff had also testified that he discovered that he received inadequate medical care from Defendants "when they sent [him] for physical therapy and [he] just couldn't walk anymore." [DE 50-1 at 26, 24:2–6]. At the hearing, Plaintiff further testified that he only questioned the quality of his medical care he when he met with attorneys after his surgery and after he could no longer walk. [DE 54 at 20:8–14].

   B.   **Exhaustion Arguments**

Defendants challenge Plaintiff's explanation for not filing a grievance, the process for which was undisputedly available to Plaintiff at all times. Defendants rely upon Plaintiff's knowledge of his symptoms, their deterioration, and their lack of improvement as proof that he had a concern worthy of a grievance. Defendants contend that a grievance would have allowed the prison's medical staff to review and possibly revise his treatment plan such that the harms he suffered would have been avoided. In other words, Defendants ask this Court to infer from Plaintiff's knowledge of his deteriorating symptoms and the accompanying frustration that he believed his care was inadequate even while he was submitting Requests for Healthcare.

5

On the other hand, Plaintiff argues that this situation is analogous to the situation faced by the pregnant prisoner in *White v. Bukowski*, 800 F.3d 392 (7th Cir. 2015) who the court found could not have known of the harm to her baby before it was born. In *White*, the court held that no administrative remedy was available to the pregnant prisoner at the time she first realized that damage had been done to her baby because of inadequate medical care. Plaintiff contends that he trusted the medical providers from whom he was receiving care to know better than he did about medical diagnoses, treatment, and prognoses. Accordingly, he explains that he only began to suspect inadequate care during post-surgery physical therapy and after he could no longer walk, which led him to seek advice of counsel. [*See* DE 50-1 at 26, 24:2–10]. Plaintiff argues that a grievance at that point would have been academic because any response to the grievance could not have changed his paraplegia.

## II.    FINDINGS OF FACT

According to Defendants in their post-hearing reply, filing a grievance only requires a prisoner to have a concern or issue with prison life, including medical care. [DE 53 at 6]. Based on that minimal standard, any conclusion in this case as to whether an administrative remedy was available to Plaintiff depends upon a determination of when Plaintiff realized that he had a concern or an issue with prison life, including his medical care. In other words, the Court must determine whether Plaintiff's concern with prison life—expressed in his complaint as allegedly inadequate medical care—arose before or after he was permanently paralyzed. Such a determination requires careful consideration of both Plaintiff's credibility and demeanor during his testimony at the evidentiary hearing and other evidence in the record.

Preliminarily, the undersigned notes that counsel for both parties have failed to present evidence that would assist Court to discern Plaintiff's relevant state of mind after the fall and

before he was permanently paralyzed.  Surprisingly, the record is not even clear on exactly when Plaintiff was deemed permanently paralyzed.  Such evidence could have been adduced had Plaintiff's counsel subpoenaed Dr. Thompson to testify at the evidentiary hearing.  Similarly, counsel for both parties could have solicited testimony from Plaintiff himself that more directly defined his formal paralysis date as well as the sequence of events that led him to question whether a better quality of medical care might have prevented his paralysis.  Nevertheless, the Court is left to its task here with this limited record.

Defendants ask this Court to question Plaintiff's credibility – essentially alleging that it was unreasonable for Plaintiff not to question the adequacy of his medical care when he knew the severity of his symptoms and was aware of the deterioration of those same symptoms.  In support, Defendants argue that Plaintiff evidenced a grievable concern about his medical care on at least ten occasions before he was permanently paralyzed.  For instance, Defendants cite the six Requests for Healthcare, which consistently utilized exclamation points, as evidence of Plaintiff's concern about the severity of his pain, his unhappiness with the effectiveness of prescribed pain medications, his inability to walk, and the numbness in his legs over a period of weeks.  Defendants also contend that Plaintiff could have grieved before his surgery when an MRI was allegedly delayed despite his report of symptoms consistent with paraplegia.  Defendants contend that after surgery, Plaintiff could have grieved the allegedly premature termination of his physical therapy.  Defendants also mention Plaintiff's allegations that nursing staff failed to help him with physical therapy and that he was denied access to his surgeon in February 2015 as other moments when a grievance would have been warranted.  Based on this evidence, Defendants argue that Plaintiff would have sought a second opinion if he were not

7

incarcerated and describes the grievance process as the procedure for getting just such a second opinion in the prison setting.

Despite Defendants' counsel's vehement argument at the evidentiary hearing and in post-hearing briefing, the Court is not persuaded to discredit Plaintiff's testimony. In essence, Plaintiff testified that he was not dissatisfied enough with his medical care before becoming permanently paralyzed to justify a grievance. Plaintiff's demeanor and testimony at the hearing were credible demonstrating nothing to lead the undersigned to question his assertion. He remained calm throughout the hearing and thoughtfully answered counsel's questions. He did not challenge Defendants' interpretation of the content of the six Requests for Healthcare admitted into evidence. More importantly, Plaintiff's testimony reflects a reasonable interpretation of the situation he faced that was also consistent with his deposition testimony.

Indeed, Plaintiff was aware of his symptoms and recognized his condition was "not normal." [DE 54 at 10:17–19]. Yet, Plaintiff still did not have perfect knowledge of his condition, the appropriate treatment for his unique symptoms, the expected outcomes for each treatment protocol prescribed, and the signs of irreversible deterioration in his condition. The undersigned cannot imagine that such perfect knowledge is likely among typical fall victims even outside the prison setting. In addition, the undersigned presumes, with limited evidence of Plaintiff's state of mind at the time of the fall and his related treatment, that Plaintiff—like anyone facing paralysis following an unexpected slip and fall—was fearful of the symptoms he was experiencing and in denial as to the possibility of such extreme consequences from his fall. Therefore, it is understandable that Plaintiff trusted the assessments and treatment plans Defendants provided.

To his credit, Plaintiff also recognized that there were limits to the care that prison medical staff could provide. Having received care each time he asked, Plaintiff reasonably sought outside medical care rather than grieve what he thought the prison staff could not provide. Moreover, Plaintiff's testimony logically implies that he understood the unfortunate reality that not every medical problem can be cured no matter the quality of medical care received. Plaintiff was not quick to blame others for his situation. Instead, he persistently sought medical care, both at the prison and outside the prison, consistent with the role of any good patient to advocate for himself in a situation where no one could guarantee a perfect outcome.

As a result, Defendants have failed to build a logical bridge from the available evidence to their conclusion that Plaintiff should have known that his deteriorating medical condition warranted a grievance. The undersigned may have been more persuaded had Defendants presented an evidence-based conclusion as to what Plaintiff actually knew about his condition and the effects of the treatment he actually received. Instead, the undersigned must rely predominantly upon the credibility of Plaintiff's hearing testimony to reach a conclusion as to Plaintiff's awareness of the possibility that his symptoms were the result of inadequate care. Accordingly, the undersigned finds that Plaintiff did not question the quality of medical care he was receiving from Defendants in response to his Requests for Healthcare until after he was permanently paralyzed.

## II.   CONCLUSIONS OF LAW

The PLRA prohibits prisoners from bringing an action in federal court with respect to prison conditions until "such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The failure to exhaust is an affirmative defense on which the defendant bears the burden of proof. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). "To exhaust remedies, a

9

prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). "[U]nless the prisoner completes the administrative process by following the rules the state has established for that process, exhaustion has not occurred." *Id.* at 1023.

Here, the question of whether Plaintiff's administrative remedies were exhausted cannot arise until the Court determines whether any administrative remedies were available to him. In determining availability, it is important to first note that "[t]he purpose of a prisoner's filing a grievance is to obtain a change of some sort—to obtain better medical care, for example." *White*, 800 F.3d at 394. Accordingly, a prisoner has to be aware of the need for action by the prison or jail to be motivated to file a grievance. *Id.*

In *Perez v. Wis. Dep't of Corrs.*, the Seventh Circuit provided the following example of a situation where an administrative remedy was unavailable to a prisoner:

> Suppose the prisoner breaks his leg and claims delay in setting the bone is cruel and unusual punishment. If the injury has healed by the time suit begins, nothing other than damages could be a 'remedy,' and if the administrative process cannot provide compensation then there is no administrative remedy to exhaust.

182 F.3d at 538. Consistent with *Perez*, the Supreme Court has specified that there is no requirement to "exhaust where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Booth v. Churner*, 532 U.S. 731, 736 (2001) (emphasis added). Indeed, "a prisoner [cannot] be expected to file a grievance that would be academic because no response would benefit him or her in the slightest." *White*, 800 F.3d at 395.

In *White*, the plaintiff was a pregnant woman whose baby was born with serious defects while she was incarcerated. *Id.* at 394. The plaintiff filed suit without pursuing administrative

10

remedies alleging that the jail defendants had been deliberately indifferent "to her need for proper prenatal care and prompt transport to a hospital for delivery of her baby." *Id.* at 393. The court found that the plaintiff may have had no reason to believe her medical care in the jail was seriously inadequate before the baby was born leaving "*no* remedy within the power of the jail to grant for the baby's birth defects." *Id.* at 395 (emphasis in original). As a result, the court held that the plaintiff did not fail to exhaust her administrative remedies because she had no administrative remedy available to her. *Id.* at 397. The court reasoned that it was "too late" for the plaintiff to obtain any remedy once she realized that she may have received inadequate medical care at the birth of her baby. *Id.* at 395.

The facts of Plaintiff's case here track the facts in *White* quite closely. Any grievance Plaintiff could have filed after his was permanently paralyzed would be academic under *White* as the prison would have had no power to act and reverse his paraplegia. Defendants try to distinguish *White* by citing Plaintiff's Requests for Healthcare as evidence of his concerns about his medical care and treatment. As discussed above, Defendants arguments are not persuasive given Plaintiff's reasonable failure to question the adequacy of his medical care until after his was permanently paralyzed. As such, Plaintiff, like the *White* plaintiff, could not have been motivated to file a grievance because he was not aware of any need to grieve the action by the health care provided or the lack of action by the prison to improve his care.

### III.   CONCLUSION

For the foregoing reasons, the undersigned finds that no administrative remedies were available to Plaintiff until after he was permanently paralyzed. Therefore, the undersigned **RECOMMENDS** that the Court **DENY** summary judgment to Defendants on their affirmative defense alleging failure to exhaust administrative remedies pursuant to 42 U.S.C. § 1997e(a).

11

NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b). Failure to file objections within the specified time waives the right to appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Lerro v. Quaker Oats Co.*, 84 F.3d 239 (7th Cir. 1996).

**SO ORDERED.**

Dated this 5th day of September 2017.

s/Michael G. Gotsch, Sr.<br>
Michael G. Gotsch, Sr.<br>
United States Magistrate Judge